**CONSOLIDATED FREIGHTWAYS CORPORATION OF DELAWARE, Plaintiff,**

v.

**Raymond KASSEL, et al., Defendants**

**Motor Club of Iowa, Defendant-Intervenor.**

Civ. No. 78–179–1.

United States District Court, S.D. Iowa, C.D.

Feb. 14, 1983.

John H. Lederer, DeWitt, McAndrews & Porter, Madison, Wis., Kent Forney, Terry Hancock, Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, Iowa, for plaintiff.

Robert W. Goodwin, Sp. Asst. Atty. Gen., Dept. of Transp., Lester Paff and Dennis Hogan, Asst. Attys. Gen., Mark Schantz, Sol. Gen., Des Moines, Iowa, for defendants.

R. Richard Bittner and Robert Lambert, Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, Iowa, for defendant-intervenor.

## ORDER

STUART, Chief Judge.

Shortly before the trial of this action in 1979, an Order was entered bifurcating plaintiff's claim for attorney's fees from other issues in the case. Following an extensive trial, the Court found for plaintiff on the merits of its Commerce Clause claim. *Consolidated Freightways Corp. v. Kassel,* 475 F.Supp. 544 (S.D.Iowa 1979). The Eighth Circuit affirmed, 612 F.2d 1064 (8th Cir.1979), as did the Supreme Court, *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981).

The Court now has before it the parties' cross-motions for partial summary judgment on the issue of plaintiff's entitlement to an award of attorney's fees under 42 U.S.C. § 1988, which provides in pertinent part: "In any action or proceeding to enforce a provision of ... [42 U.S.C. §] 1983 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

■ The Court notes that the "discretion" mentioned in § 1988 is circumscribed by case law which holds that a prevailing party in a § 1983 action "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Williams v. Miller,* 620 F.2d 199, 202 (8th Cir.1980). The burden of proving such "special circumstances" is on the losing defendant. *Ibid.* At this time, however, the question of the existence of "special circumstances" is not before the Court. The narrow question as presented in the cross-motions for partial summary judgment is whether plaintiff is entitled to an attorney's fee award under § 1988 *absent* proof of "special circumstances" by defendants.

There is no dispute over the fact that plaintiff is the "prevailing party" in this case. Thus, the question before the Court is whether this dormant Commerce Clause action can be considered an "action or proceeding to enforce a provision of ... [42 U.S.C. §] 1983."

Plaintiff's amended complaint asserted that, in addition to violating the Commerce Clause of the Constitution, Iowa's statutory ban on 65-foot twin trailer trucks violated the Fourteenth Amendment and 42 U.S.C. § 1983. The Court found for plaintiff on the Commerce Clause ground. The question of whether plaintiff had appropriately asserted § 1983 as an alternative basis for relief was not decided. Similarly, the Eighth Circuit and the Supreme Court affirmed on Commerce Clause grounds, apparently without ever considering whether § 1983 was also an appropriate basis for liability.

■ Defendants concede, however, that the fact that plaintiff prevailed on a ground other than § 1983 does not necessarily preclude an award of attorney's fees under § 1988. *See Maher v. Gagne,* 448 U.S. 122, 132 n. 15, 100 S.Ct. 2570, 2576 n. 15, 65 L.Ed.2d 653 (1980). If § 1983 would have been an appropriate basis for relief, then plaintiff has a general entitlement to attorney's fees under § 1988 even though relief was actually awarded on another ground. *Ibid.*

Section 1983 states in pertinent part:

Every person who, under color of any statute, ... of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction thereof to the deprivation *of any rights, privileges, or im-*

*munities secured by the Constitution* and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

(Emphasis added.) Plaintiff argues that Iowa's ban on long trucks deprived plaintiff of two "rights . . . secured by the Constitution," either of which would constitute a basis for applying § 1983: (1) plaintiff's right, under the Commerce Clause, to engage in interstate commerce free from undue burdens imposed by a state, and (2) plaintiff's right not to be deprived of property without due process of law. The Court will first address plaintiff's due process argument.

## I. *Due process.*

■■■ The right to due process of law in conjunction with deprivations of life, liberty or property by a state is a right secured by the Fourteenth Amendment. Violations of that amendment, including those which involve deprivations of property, are clearly within the ambit of § 1983. *Lynch v. Household Finance Corp.,* 405 U.S. 538, 543, 92 S.Ct. 1113, 1117, 31 L.Ed.2d 424 (1972). The question, therefore, is whether Iowa's long truck ban did in fact deprive plaintiff of property without due process of law.

■■■ Defendants argue that plaintiff was not deprived of property within the meaning of the Fourteenth Amendment. The Court need not resolve that question because, even assuming that there was a deprivation of property, the Court perceives no lack of due process. Plaintiff states that "[t]he first element of due process of law is that the person acting have the authority and jurisdiction to act." Plaintiff then argues that because Iowa's statutory ban on long trucks was ultimately found by the federal courts to violate the Commerce Clause, it follows that the Iowa legislature lacked the authority to pass such a statute. The Court views this as merely a "bootstrapping" argument. In the Court's opinion, the Iowa legislature had authority, for due process purposes, to enact laws governing the use of highways within Iowa's borders; the fact that one of those laws was subsequently found to place an unconstitu-

tional burden on interstate commerce does not transform the enactment of that particular statute into a due process violation. Moreover, under the "arbitrariness" standard which has governed substantive due process challenges to economic regulations since *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), Iowa's statute would clearly survive scrutiny. The Court therefore holds that plaintiff has failed to demonstrate a Fourteenth Amendment violation as a basis for applying § 1983.

## II. *Commerce Clause.*

Plaintiff has established its Commerce Clause claim. Therefore, the question here is whether the Commerce Clause secures rights which are cognizable under § 1983. To answer this question, the Court will examine relevant case law, the nature of the Commerce Clause, and the legislative history of § 1983.

### A.

The theory underlying plaintiff's successful Commerce Clause claim was explained by the Supreme Court as follows:

> The [Commerce] Clause permits Congress to legislate when it perceives that the national welfare is not furthered by the independent actions of the States. It is now well established, also, that the Clause itself is "a limitation upon state power even without congressional implementation." The Clause requires that some aspects of trade generally must remain free from interference by the States. When a State ventures excessively into the regulation of these aspects of commerce, it "trespasses upon national interests," and the courts will hold the state regulation invalid under the Clause alone.

*Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 669, 101 S.Ct. 1309, 1315, 67 L.Ed.2d 580 (1981) (citations omitted).

In determining whether such "dormant" Commerce Clause claims come within § 1983, an examination of the jurisdictional

basis which has historically been utilized in such cases may be a useful starting point. The jurisdictional counterpart of § 1983 is 28 U.S.C. § 1343(3). Although § 1343(3) does not provide jurisdiction for every § 1983 claim which is based on violation of a federal *statutory* right, *see Maine v. Thiboutot,* 448 U.S. 1, 8 n. 6, 100 S.Ct. 2502, 2506 n. 6, 65 L.Ed.2d 555 (1980), it does provide jurisdiction for all § 1983 cases which are based on deprivation of constitutional rights, and the two sections are construed identically in such cases. *Lynch v. Household Finance Corp.,* 405 U.S. 538, 544 n. 7, 92 S.Ct. 1113, 1118 n. 7, 31 L.Ed.2d 424 (1972).

Traditionally, dormant Commerce Clause actions have been brought directly under the Constitution, with jurisdiction predicated on 28 U.S.C. § 1331 (the general federal question jurisdictional statute)[1] rather than under § 1983 and its jurisdictional counterpart, § 1343(3). *See, e.g., New York State Waterways Association, Inc. v. Diamond,* 469 F.2d 419 (2d Cir.1972); *International Packers Ltd. v. Hughes,* 271 F.Supp. 430 (S.D.Iowa 1967). Plaintiff suggests that this is because, prior to Congress's enactment of the § 1988 attorney's fee provision in 1976, there was never any need to establish the availability of § 1983 in such cases. Although this legislative change has undoubtedly provided an additional incentive to use § 1983, an incentive did exist prior to 1976 by reason of the fact that § 1331 contained an amount in controversy requirement,[2] while there was no such requirement for actions brought under § 1983. *See* § 1343(3).

One case in which this incentive became operative was *Connor v. Rivers,* 25 F.Supp. 937 (N.D.Ga.1938), *aff'd,* 305 U.S. 576, 59 S.Ct. 359, 83 L.Ed. 363 (1939). The court in that case, after determining that the amount in controversy was insufficient to meet the requirement of the general federal question jurisdictional statute, went on to consider whether there was jurisdiction under § 1343(3) (then codified as 28 U.S.C. § 41(14)). The three-judge court stated that the history of § 1983 (then codified as 8 U.S.C. § 43) persuaded them that its jurisdictional counterpart § 41(14) "does not give jurisdiction in this suit." *Id.* at 938. The court explained: "While there is an allegation about the Georgia statute's interfering with interstate commerce, it is clear that there is no claim or evidence that said Georgia statute deprives the petitioner 'of any right, privilege, or immunity, secured by the Constitution of the United States [. . .].'" *Ibid. Connor* was affirmed by the Supreme Court in a one-sentence per curiam opinion relating to the lack of the requisite jurisdictional amount. 305 U.S. at 576, 59 S.Ct. at 359. Thus, although the Supreme Court did not expressly discuss the applicability of § 1983 and § 1343(3) to dormant Commerce Clause cases, its affirmance in *Connor* signifies that it agreed with the three-judge court's conclusion that § 1343(3) was unavailable and that the jurisdictional amount of § 1331 must therefore be satisfied.

Following *Connor,* it appears that dormant Commerce Clause cases originating in the federal courts have proceeded on the assumption that § 1331 is the sole appropriate basis for jurisdiction and that the jurisdictional amount of that statute must be satisfied. *See, e.g., New York State Waterways Association, supra; International Packers Ltd., supra.* Accordingly, Prof. Moore, after discussing categories of cases which can be brought under § 1983 and § 1343(3) without regard to the amount in controversy requirement of § 1331, stated: "There remain some cases in which redress is sought against action taken under color of law in which the litigation must proceed

---

1. A number of the dormant Commerce Clause cases which have reached the United States Supreme Court did not originate in federal court, but rather in state court regulatory proceedings where a party objected to a state statute or regulation on Commerce Clause grounds. *See, e.g., Hood & Sons, Inc. v. Du-*

*Mond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949); *Cooley v. Board of Wardens,* 12 How. 299, 13 L.Ed. 996 (1851).

2. The $10,000 amount in controversy requirement was eliminated from § 1331 on December 1, 1980, by Pub.L. 96–486, 94 Stat. 2369.

under § 1331 and the minimum amount in controversy must be shown. Actions against federal officers constitute one example. Another example is to be seen in actions challenging legislation as violative of the Commerce Clause." 1 J. Moore, Moore's Federal Practice ¶ 0.62 [2.–2] at 665–66 (1977) (citations omitted).

## B.

Despite the Supreme Court's affirmance of *Connor, supra,* and the consistent treatment of dormant Commerce Clause actions subsequent to *Connor,* two recent cases decided by lower federal courts have held that § 1983 is an appropriate vehicle for dormant Commerce Clause actions.[3] In *Confederated Salish and Kootenai Tribes v. Moe,* 392 F.Supp. 1297 (D.Mont.1974), and its companion case, *Confederated Salish and Kootenai Tribes v. Montana,* 392 F.Supp. 1325 (D.Mont.1975) (hereinafter referred to jointly as *Kootenai*), an Indian tribe and certain of its individual members challenged two separate Montana taxing schemes, partly on Commerce Clause grounds. In each case, after finding jurisdiction over the tribal claims under 28 U.S.C. § 1362,[4] the three-judge district court went on to find that it had jurisdiction over the individual claims under § 1343(3) because the "alleged violation of Commerce Clause rights" stated a claim under § 1983. 392 F.Supp. at 1304–05, 1327. The Supreme Court affirmed the lower court's jurisdictional holdings with regard to the tribal claims under § 1362, but found it unnecessary to determine the propriety of the district court's conclusion that jurisdiction over the individual claims

existed under § 1343(3). *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 475 n. 14, 96 S.Ct. 1634, 1642 n. 14, 48 L.Ed.2d 96 (1976). The Supreme Court did, in a footnote, remind the district court that in further proceedings, any claims which could only be pursued by the individual plaintiffs "must be properly grounded jurisdictionally. See, *e.g., Zahn v. International Paper Co.,* 414 U.S. 291, 294 [94 S.Ct. 505, 508, 38 L.Ed.2d 511] (1973)." 425 U.S. at 469 n. 7, 96 S.Ct. at 1639 n. 7.

The other recent case favoring plaintiff's position is *Kennecott Corp. v. Smith,* 637 F.2d 181 (3d Cir.1980), in which a corporation sought to enjoin enforcement of New Jersey's Corporation Takeover Bid Disclosure Law, primarily on the ground that it conflicted with the Williams Act, 15 U.S.C. § 78a et seq. *Kennecott,* 637 F.2d at 182. The defendants contended that the relief sought was barred by the anti-injunction act, 28 U.S.C. § 2283. The Third Circuit panel found § 2283 inapplicable on two alternative grounds, one of which was that "actions brought under § 1983, such as this case, are explicit exceptions to the anti-injunction act." 637 F.2d at 186 (citing *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972)). In a footnote, the Court explained: "The present action is properly brought under § 1983 because it seeks redress for deprivations of constitutional rights secured by the commerce clause and of federal statutory rights protected by the Williams Act. *See Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980)." 637 F.2d at 186 n. 5.

Although the statements in *Kootenai* and *Kennecott* are on point, the Court is hesi-

---

3. Defendants assert, however, that another recent case, *Czajkowski v. State of Illinois,* 460 F.Supp. 1265, 1277–79 (N.D.Ill.1977), aff'd, 588 F.2d 839 (7th Cir.1978), reaffirms the *Connor* holding. The Court notes that the basis of *Czajkowski's* holding that there was no § 1343(3) jurisdiction was not that the plaintiff's claims were based on the Commerce Clause, but that they came within a special tax case exception to § 1343(3) jurisdiction. Thus, no weight will be accorded *Czajkowski* in deciding the question before this Court.

4. Section 1362 provides:

> The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

It should be noted that this section is phrased in the broad "arises under the Constitution" language of § 1331 rather than the "right, privilege or immunity secured by the Constitution" language of § 1343(3).

tant to rely on either case because: (1) they are directly contrary to the holding of *Connor,* which was affirmed by the Supreme Court; (2) the pertinent holdings of *Kootenai* and *Kennecott* have not been reviewed by the Supreme Court; and (3) neither *Kootenai* nor *Kennecott* contains any substantial discussion of the basic question argued by the parties in this case, i.e., whether the Commerce Clause secures rights which are cognizable in a § 1983 action.

The sole authority relied upon by the three-judge district court in *Kootenai,* 392 F.Supp. at 1304–05, was dictum from a footnote in *Lynch v. Household Finance Corp.,* 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), which noted that the phrase "rights, privileges, or immunities secured ... by the Constitution" had been interpreted "to embrace '*all* of the Constitution'." 405 U.S. at 549 n. 16, 92 S.Ct. at 1120 n. 16 (quoting *United States v. Price,* 383 U.S. 787, 797, 86 S.Ct. 1152, 1158, 16 L.Ed.2d 267 (1966)). Even in *Price,* the source of the *Lynch* footnote, the quoted statement was dictum. The issue there was whether 18 U.S.C. § 241, the criminal statute involving conspiracies to deprive a citizen of his constitutional rights, included rights protected by the Fourteenth Amendment. 383 U.S. at 797, 86 S.Ct. at 1158. In holding that it did, the Supreme Court noted that both § 241 and 18 U.S.C. § 242 (a similar criminal statute lacking the conspiracy element) included, without limitation, rights or privileges secured by the Constitution or laws of the United States. The Court then stated: "Each includes, *presumably, all* of the Constitution and laws of the United States." 383 U.S. at 797, 86 S.Ct. at 1158 (emphasis on "all" in original; emphasis on "presumably" added).

■ In addition to being dictum, this statement does not answer the question of whether the Commerce Clause, which is phrased in terms of a grant of power to the federal government, is a constitutional provision which secures rights as meant in § 1983. Although the Supreme Court has held that the phrase "rights, privileges, or immunities secured by the ... laws" of the United States in § 1983 is not limited to certain subject-matter categories of legislation, *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), it has also recognized that not all statutes secure rights within the meaning of § 1983, even though individuals may benefit from their provisions. *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981); *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981). Likewise, although § 1983 "presumably" extends to rights secured in any part of the Constitution, *Lynch,* 405 U.S. at 549 n. 16, 92 S.Ct. at 1120 n. 16; *Price,* 383 U.S. at 797, 86 S.Ct. at 1158, there undoubtedly are provisions of the Constitution which do not secure rights within the meaning of § 1983 and § 1343(3). *See Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 612–15, 99 S.Ct. 1905, 1913–14, 60 L.Ed.2d 508 (1979) (holding that the Supremacy Clause is not a constitutional provision which secures rights within the meaning of § 1343(3)).

The authority relied upon in the *Kennecott* footnote is likewise nondispositive. The only case cited there is *Thiboutot, supra,* which merely held that the phrase "and laws" in § 1983 is not restricted to federal statutes providing for equal rights, or to any other subset of laws. As noted in the preceding paragraph, this holding has little bearing on the question of whether the Commerce Clause is a constitutional provision which secures rights within the meaning of § 1983.

### C.

Having discovered no case law which adequately addresses the question, the Court will proceed with its own determination of whether a claim under the dormant Commerce Clause alleges a deprivation "of any right, privilege or immunity secured by the Constitution of the United States," within

the meaning of § 1343(3).[5] The Court takes as its starting point the proposition that not every case which "arises under" the Constitution (the language used in § 1331) involves a "right, privilege or immunity secured by the Constitution" within the meaning of § 1343(3). This is made clear by the Supreme Court's holding in *Chapman*, 441 U.S. at 615, 99 S.Ct. at 1914, that a Supremacy Clause claim, which can normally be brought under § 1331,[6] does not involve any rights "secured by the Constitution" within the meaning of § 1343(3).

The Commerce Clause of the Constitution (Art. I, § 8, cl. 3) is facially different from the Supremacy Clause, in that the Commerce Clause is a specific grant of legislative power to the Congress with regard to a particular subject matter: "The Congress shall have Power . . . to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes". From this specific grant of power, however, has evolved the doctrine that states may not enact regulations which unduly burden interstate commerce even when Congress has failed to exercise its power to establish a uniform national regulation on the particular subject.[7] This "dormant" Commerce Clause doctrine, like the Supremacy Clause, limits the power of a state when the exercise of its otherwise legitimate power comes into conflict with a broader national interest.

Defendants contend that only those constitutional provisions which limit governmental power over individuals should be considered "rights, privileges, or immunities" within the meaning of § 1983, and that provisions such as the Supremacy Clause and dormant Commerce Clause, which are primarily aimed at limiting the power of one government vis-a-vis another government, should be excluded. The distinction between the two types of provi-

sions is well explained in J. Choper, Judicial Review in the National Political Process at 174–75 (1980), as follows:

When a litigant contends that the national government (usually the Congress, but occasionally the executive, either alone or in concert with the Senate) has engaged in activity beyond its delegated authority, or when it is alleged that an attempted state regulation intrudes into an area of exclusively national concern, the constitutional issue is wholly different from that posed by an assertion that certain government action abridges a personal liberty secured by the Constitution. The essence of a claim of the latter type—which falls into the individual rights category of constitutional issues . . .—is that no organ of government, national or state, may undertake the challenged activity. In contrast, when a person alleges that one of the federalism provisions of the Constitution has been violated, he implicitly concedes that one of the two levels of government—national or state—has power to engage in the questioned conduct. The core of the argument is simply that the particular government that has acted is the constitutionally improper one. To put it another way, a federalism attack on conduct of the national government contends that only the states may so act; a federalism challenge to a state practice asserts that only the central government possesses the exerted power; neither claim denies government power altogether.

The dormant Commerce Clause doctrine is clearly a "federalism" provision within Prof. Choper's framework, because a dormant Commerce Clause action does not deny government power altogether:

Because the Constitution puts the ultimate power to regulate commerce in Con-

---

5. It is appropriate to re-emphasize here that in cases where deprivation of a constitutional right is relied upon, the scope of § 1983 is co-extensive with that of § 1343(3). *Lynch*, 405 U.S. at 544 n. 7, 92 S.Ct. at 1118 n. 7.

6. Section 1331 jurisdiction was unavailable in *Chapman* only because the amount in contro-

versy did not exceed $10,000. 441 U.S. at 606, 99 S.Ct. at 1910.

7. The case from which this doctrine stems is *Cooley v. Board of Wardens*, 12 How. 299, 13 L.Ed. 996 (1851).

gress, rather than the states, the degree of state legislation's interference with that commerce may be weighed by federal courts to determine whether the burden makes the statute unconstitutional. *The courts could not invalidate federal legislation for the same reason because Congress,* within the limits of the Fifth Amendment, *has authority to burden commerce if that seems to it a desirable means of accomplishing a permitted end.* Morgan v. Virginia, 328 U.S. 373, 380, 66 S.Ct. 1050, 1054, 90 L.Ed. 1317 (1946) (footnotes omitted) (emphasis added). Thus, although Iowa cannot ban 65-foot trucks on interstate routes, Congress could legitimately enact such a prohibition.

Although the Court recognizes that a number of Supreme Court cases have referred to a constitutional "right" to engage in interstate commerce, *e.g., Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967); *Western Union Telegraph Co. v. Kansas,* 216 U.S. 1, 36, 30 S.Ct. 190, 201, 54 L.Ed. 355 (1910); *Crutcher v. Kentucky,* 141 U.S. 47, 57, 11 S.Ct. 851, 853, 35 L.Ed. 649 (1891), the Court agrees with defendants that the Commerce Clause was adopted, and the dormant Commerce Clause doctrine has evolved, primarily to further the collective national interest in an efficient economy. *See generally Hood & Sons, Inc. v. DuMond,* 336 U.S. 525, 532–34, 69 S.Ct. 657, 662–663, 93 L.Ed. 865 (1949). For example, in the Supreme Court's opinion in the case at bar, the emphasis is on the role of the Commerce Clause in preventing state regulation from "trespass[ing] upon national interests," *Kassel,* 450 U.S. at 669, 101 S.Ct. at 1315 (quoting *Great A & P Tea Co.*

*v. Cottrell,* 424 U.S. 366, 373, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976)), and from "impair[ing] significantly the federal interest in efficient and safe interstate transportation," 450 U.S. at 671, 101 S.Ct. at 1316, rather than guarding plaintiff's individual interests against governmental intrusion.

Of course, businesses engaged in interstate commerce do benefit from the existence of the Commerce Clause and accordingly they often have standing to bring lawsuits to vindicate the national interest protected by that Clause. This does not mean, however, that the Clause should be viewed as a provision securing the rights of individuals against government action rather than the allocation-of-powers or "federalism" provision that it fundamentally is.

Plaintiff argues that the two constitutional categories—provisions which allocate power and provisions which secure rights—are not mutually exclusive, suggesting that the purpose of allocating power in a particular manner is often to secure rights. Plaintiff cites as an example the requirement that all appropriations bills originate in the House of Representatives of Congress. This and other power-allocating provisions of the Constitution, however, are qualitatively different from constitutional provisions which are normally viewed as securing rights. Inuring primarily to the benefit of the nation as a political and economic whole, and only secondarily or indirectly to the benefit of individuals, the "rights" secured by such power-allocating provisions stand in clear contrast to an individual's right to freedom from unreasonable searches and seizures, or an individual's right not to incriminate himself.[8]

---

**8.** Prof. Choper explains the difference as follows:

There is a distinctive qualitative difference separating constitutional issues of federalism from those of individual liberty .... [T]he difference may be described as one between issues of practicality and issues of principle.

When government action abridges constitutionally ordained personal liberties, it seems likely that at least in view of short-run concerns for efficient public administration and businesslike accomplishment of laudable public objectives, the commonwealth would

usually be better served by compromising the interests seeking judicial protection .... In the main, it is only our historic ideals and special regard for the dignity of the individual that compel the collective will to subjugate its more immediate needs to the preservation of designated individual rights. In short, it is government according to principle.

Constitutional issues of federalism, on the other hand, are a distinguishable species.... [These issues involve the question] whether, as a functional matter, the states are separately capable of effecting the desired result.

The Court's review of the legislative history of § 1983 persuades it that the statute was not intended to provide a remedy for constitutional violations of the type involved in this case. Section 1983 was originally § 1 of the Ku Klux Klan Act of 1871, which had used § 2 of the Civil Rights Act of 1866, 14 Stat. 27, as its model. *Chapman*, 441 U.S. at 628, 99 S.Ct. at 1921. The 1871 Act was enacted by Congress pursuant to the power vested in it by § 5 of the Fourteenth Amendment to enforce the provisions of that amendment. *Monroe v. Pape*, 365 U.S. 167, 171, 81 S.Ct. 473, 475, 5 L.Ed.2d 492 (1961). The statute's primary purpose was to provide a remedy for the new panoply of individual rights which were secured against state interference by the Fourteenth Amendment. That the statute was not intended to provide a means of enforcing constitutional provisions which allocate power between the state and the national government is demonstrated by the following statement of Rep. Shellabarger, a leading proponent of the 1871 Act, during the Congressional debates:

> Most of the provisions of the Constitution which restrain and directly relate to the States, such as those in the tenth section of first article, that 'no State shall make a treaty,' 'grant letters of marque,' 'coin money,' 'emit bills of credit,' & c., relate to the divisions of the political powers of the State and General Governments. They do not relate directly to the rights of persons within the States and as between the States and such persons therein. These prohibitions upon the political powers of the States are all of such nature that they can be, and even have been, when the occasion arose, enforced by the courts of the United States declaring void all State acts of encroachment on Federal powers. Thus, and thus sufficiently, has the United States 'enforced' these provisions of the Constitution. But there are some that are not of this class. These are where the court secures the

rights or liabilities of persons within the States, as between such persons and the States.

Cong.Globe, 42d Cong., 1st Sess., App. 68. The clear implication of Rep. Shellabarger's statement is that the 1871 Act was designed to provide a remedy for the latter category of constitutional violations he discusses, and not the former.

The Court also notes that the Eighth Circuit has warned against expansion of the coverage of § 1983 "into areas unrelated to the interests protected by the Fourteenth Amendment." *First National Bank of Omaha v. Marquette National Bank of Minneapolis*, 636 F.2d 195, 199 (8th Cir.1980), *cert. denied*, 450 U.S. 1042, 101 S.Ct. 1761, 68 L.Ed.2d 240 (1981). Although the question in that case was whether a federal *statute* secured any "rights, privileges, or immunities" within the meaning of § 1983, the Court believes the following statement from the opinion gives some indication of the Eighth Circuit's position on the existence of a right protectable by § 1983 in the case at bar: "It is our view that section 1983 does not authorize a suit for an alleged violation of a purely economic regulatory statute affecting only commercial institutions as is the case here." *Ibid.* n. 3.

■ In summary, the Court holds that § 1983 was not intended to, and does not, provide a remedy for a dormant Commerce Clause claim. Section 1983 is concerned with the relationship between individuals and the states in matters involving life, liberty or property, and was not intended to apply to the distribution of powers between the general and state governments under our federal system. Because the Court concludes that the above-captioned action does not contain a valid claim under § 1983,[9] and because the existence of such a claim is the sole basis for plaintiff's asserted entitlement to attorney's fees under 42 U.S.C. § 1988, it follows that plaintiff is not entitled to recover attorney's fees under that section.

---

The ... question posed is thus one of comparative skill and utility—in a word, an issue of practicability.

J. Choper, *supra*, at 201–02.

**9.** In light of this conclusion, it is unnecessary to address other issues raised by the parties' cross-motions and briefs.

IT IS THEREFORE ORDERED that plaintiff's motion for partial summary judgment on the issue of plaintiff's entitlement to attorney's fees be and it hereby is denied.

IT IS FURTHER ORDERED that the motions of defendants and the defendant-intervenor for partial summary judgment on the issue of plaintiff's entitlement to attorney's fees be and they hereby are granted.

IT IS FURTHER ORDERED that the Clerk of Court is authorized and directed to enter judgment in favor of the defendants and against the plaintiff for the court costs related to this sole remaining issue.